# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| INFINITE MACHINES, LLC and | : | |
| LINK GROUP INTERNATIONAL, LLP, | : | |
|     Plaintiffs, | : | |
| | : | |
|        v. | : | Civil No. 3:07cv675 (PCD) |
| | : | |
| HASBRO, INC., | : | |
|     Defendant. | : | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

Infinite Machines, LLC, and Link Group International, LLP ("Plaintiffs") filed an action for breach of contract, fraud and misrepresentation, and breach of fiduciary duty against Hasbro, Inc. ("Defendant").  Defendant moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment, and Plaintiffs have filed a cross motion for partial summary judgment on all issues except damages.  For the reasons stated herein, Defendant's motion for summary judgment [Doc. No. 30] is **GRANTED** and Plaintiffs' cross motion for partial summary judgment [Doc. No. 34] is **DENIED**.

## I.      Background

Plaintiff Infinite Machines, LLC ("IM") is organized under the laws of California and has its principal place of business in California.  IM creates, develops, and licenses electronics, toys, and consumer products.  Plaintiff Link Group International, LLP ("LGI") is organized under the laws of Connecticut and has its principal place of business in Connecticut.  LGI invents and develops a variety of consumer goods.  Defendant Hasbro, Inc. is based in Rhode Island and designs, manufactures, and markets games and toys.

Plaintiffs presented to Defendant the concept of ION[1] in April 2002.  ION is an interactive electronic learning aid for children, which is played on a television.  Plaintiffs and Defendant entered into three consecutive Option Agreements which collectively gave Defendant exclusive rights to review and evaluate ION from March 28, 2003 through August 1, 2004.[2] Plaintiffs received $290,000 total in consideration for entering into the three Option Agreements, as an advance against royalties.

Defendant conducted market surveys between 2002 and 2005 which indicated that consumers would respond well to the proposed ION product.  (Pl. 56(a)(1) Statement, ¶ 12.) Plaintiffs and Defendant entered into a License Agreement ("Agreement") concerning ION in August 2004,[3] giving Defendant sole and exclusive rights to manufacture and distribute the product. (License Agreement, ¶ 2(a).)  In consideration for entering into the Agreement, Defendant pledged to advance Plaintiffs $50,000 against royalties and to pay Plaintiffs specific percentages of net sales of the product.  (License Agreement, ¶ 6(a)(ii).)  Defendant did not ship ION to stores until the summer of 2006, in part due to technical problems with its development. (Pl. 56(a)(1) Statement, ¶¶ 32-33.)

In response to Plaintiffs' complaints regarding lost royalties due to this delay, Plaintiffs and Defendant signed an Amendment to the License Agreement on January 4, 2006 ("Amendment").  The Amendment stated that the $340,000 that Plaintiffs had received from the

---

[1] The product was originally named Learntastic and was later renamed ION.

[2] Option Agreement 1 is dated March 28, 2003, but both parties agree that Option Agreement 1 was signed in May 2003.  (Pl. 56(a)(1) Statement, ¶ 8.)  Option Agreement 2 is dated October 10, 2003.  Option Agreement 3 is dated March 1, 2004, and expired August 1, 2004.

[3] Although the parties signed the Agreement in August 2004, they backdated the Agreement to October 10, 2003.

License Agreement and the three Option Agreements would not be credited against royalties, as originally planned, instead becoming outright payments to Plaintiffs. (Amendment to License Agreement, ¶ 1.) Defendant also agreed to pay Plaintiffs an additional $275,000 as an advance payment against future royalties. (Id., ¶ 2.) The Amendment did not set a date on which Defendant was required to ship ION to stores. Plaintiffs allege that Defendant verbally promised to ship ION in 2006, and that Defendant said it was addressing and would fix operational problems with the product before it was shipped. (Pl. 56(a)(1) Statement, ¶¶ 36-40.) Plaintiffs further maintain that Defendant verbally pledged to keep Plaintiffs informed regarding the development of ION. (Id., ¶ 36.)

Included in the Amendment is a Release Clause ("Release"), the meaning of which is disputed. Plaintiffs and Defendant disagree as to what legal remedies Plaintiffs retained subsequent to executing the Release. Plaintiffs also question the validity of the Release, claiming that they signed the Release based on misrepresentations made by Defendant and that the Release is therefore void. (Pl. 56(a)(1) Statement, ¶ 41.)

Both Defendant and Plaintiffs were aware of technical and operational problems with ION prior to executing the Release in January 2006. (Pl. 56(a)(1) Statement, ¶ 33.) For example, on July 28, 2005, Defendant had communicated to Plaintiffs that problems with ION's manufacture would delay the product's release. (Id.) Plaintiffs acknowledge that they were aware of problems with ION's functioning prior to signing the Agreement, since Plaintiffs had anticipated problems with the software that Defendant had selected, and had urged Defendant to consider alternatives. (Compl. ¶¶ 35-37.) Defendant conducted several tests in 2005 and 2006 that revealed to them that problems persisted with ION. (Pl. 56(a)(1) Statement, ¶¶ 43-45, 53,

56, 58-59.)  Plaintiffs also tested the product and on May 3, 2006 gave a report to Defendant with results and proposals for improving the product, highlighting similar deficiencies to those identified by Defendant in their tests.  (Pl. 56(a)(1) Statement, ¶ 81.)

Defendant first shipped ION to stores in late July or August 2006.[4]  Although Defendant was aware of continued problems with ION, Defendant shipped ION in an effort to recover some expenses, considering that Defendant spent over $17.7 million dollars on the development and marketing of ION.  (Pl. 56(a)(1) Statement, ¶¶ 16, 120-121.)  Sales of ION were not strong and a significant number of units were returned.  (Id., ¶¶ 126, 127, 131.)

Plaintiffs now seek lost revenues and direct, consequential, and punitive damages, including for loss of market position.  Plaintiffs in their May 1, 2007 Complaint allege breach of contract, breach of the implied covenant of good faith and fair dealing, breach of confidentiality, fraud and misrepresentation, negligent misrepresentation, breach of fiduciary duty, and misappropriation of property and conversion.  Defendant moved for summary judgment on December 30, 2008 as to all claims.  Plaintiffs subsequently withdrew their claims of breach of confidentiality and misappropriation of property and conversion.  (Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 3 n.1.)  Therefore, Defendant's motion for summary judgment is hereby **granted** as to Plaintiffs' claims of breach of confidentiality and misappropriation of property and conversion.  Plaintiffs also made a cross motion for partial summary judgment on all remaining claims, reserving only the issue of damages for the trier of fact.

II.    **Standard of Review**

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure

---

[4] The record is unclear as to precisely when shipments began, but the exact shipping date is not relevant.

4

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d, 265 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). In determining whether the parties have met their respective burdens, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) (citations omitted). However, the non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also FED. R. CIV. P. 56(e). The Court applies the same standard where it

5

is presented with cross motions for summary judgment, and thus each movant has the burden of presenting evidence to support its motion. Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988) (citing Eastman Mach. Co. v. U.S., 841 F.2d 469, 473-74 (2d Cir. 1988)).

## III.   Discussion

### A.   Contract Interpretation

Plaintiffs and Defendant agree that Rhode Island law governs the Agreement.  (License Agreement, ¶ 14; Def. Motion for Summ. J., 11; Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 28 n.2.)  Determining whether a contract is ambiguous is a matter for the Court to decide.  Newport Plaza Assocs., L.P., v. Durfee Attleboro Bank,  985 F.2d 640, 644-45 (1st Cir. 1993).  Where the Court determines ambiguity exists in a contract's language, contract interpretation becomes a question of fact for the jury.  Id. at 644.  Contract language is ambiguous where the language of the contract is "reasonably susceptible of different constructions."  D.T.P., Inc. v. Red Bridge Props., Inc., 576 A.2d 1377, 1381 (R.I. 1990) (citing Westinghouse Broad. Co. v. Dial Media, Inc., 410 A.2d 986, 991 (R.I. 1980)).

When the language of a contract is not ambiguous and is clear, the language "is to be accorded its plain and natural meaning."  Newport Plaza, 985 F.2d at 645.  The Court is "duty bound to construe contractual terms in the context of the contract as a whole."  Id. at 646.  The Court's primary task "is to attempt to ascertain the intent of the parties . . . [by] look[ing] at the instrument as a whole and not at some detached portion thereof."  Colonial Penn Ins. Co. v. Mendozzi, 488 A.2d 734, 736 (R.I. 1985) (citing Woonsocket Teachers' Guild, Local 951 v. Sch. Comm. of Woonsocket, 367 A.2d 203, 205 (R.I. 1976)).

### 1.   Meaning of "Usual High Quality" in License Agreement

6

The parties differ in their interpretation of the meaning of "usual high quality" in the following section of the Agreement:

> [Defendant] agrees that [ION] shall be of [Defendant's] usual high quality, and agrees to indemnify, defend and hold [Plaintiffs] . . . harmless from and against any and all claims, suits, loss, and expense (including reasonable attorneys' fees and disbursements) arising out of any claims of personal injury or property damage based on the use of [ION] produced and sold by [Defendant] and/or its Affiliates . . . .

> License Agreement, ¶ 8(b).

Defendant contends that this provision, which appears in the Agreement's "Indemnification and Defensive Litigation" section,[5] is a representation by Defendant that it will produce a product of its usual high quality, such that the product will not give rise to personal injury or property damage lawsuits, or if the product does give rise to such suits, Defendant will fully indemnify Plaintiffs. Plaintiffs, however, argue that generating royalties was the "principal objective" of the contract (Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 39), and that "usual high quality" is therefore a warranty that Defendant will manufacture a "high functioning" product. (Id., 35.) Defendant responds that a guarantee with respect to product quality, independent of a baseline level of quality for safe functioning, would be set forth in a separate warranty section, not buried in the indemnification section. (See Def. Reply in Further Support of Mot. for Summ. J., 10.)

Plaintiffs claim that ambiguity in the contract should be construed against Defendant, since Defendant drafted the document. However, the Court finds no ambiguity in the language of the contract and therefore will accord the provision its "plain and natural meaning," consistent

---

[5] Consistent with the terms of the Agreement, the Agreement's headings are used "for reference purposes only and will not affect the meaning or interpretation of this Agreement." (License Agreement, ¶ 17.)

with the contract as a whole.  See Newport Plaza, 985 F.2d at 645-46.  When taken in context, the term "usual high quality" is not a guarantee that Defendant will make a "high functioning" product, as Plaintiffs argue.  Plaintiffs' interpretation of the term seeks to impose an additional obligation on Defendant that is not found in the Agreement.  One would expect a very subjective term such as "usual high quality" to be elaborated or defined in some detail if it were intended to give rise to liability on Defendant's part should Defendant fail to meet the standard.  However, no standard or method for evaluating what constitutes "usual high quality" is set forth anywhere in the Agreement.  Through this contract term, Defendant did not obligate itself to make a "high functioning" product.  Rather, as the paragraph taken as a whole makes clear, Defendant pledged to make a product of a high quality that would not cause personal injury or property damage, and in the event that the product did cause personal injury or property damage, to indemnify Plaintiffs against resulting lawsuits.

## 2.    Plaintiffs' Causes of Action Under the License Agreement

The parties dispute what legal remedies are available to Plaintiffs under the Agreement and whether Plaintiffs are limited to termination of the contract and reversion of their rights to ION.  Section 9(d) of the Agreement reads in relevant part:

> It is understood and agreed that if [Defendant], after having undertaken the marketing and sale of products embodying [ION], ceases sales and sublicensing of all products and services embodying [ION] for a period of one (1) year, except as excused hereinbelow, [Plaintiffs] may give notice to [Defendant] of [their] desire to terminate this Agreement for that reason [and all rights granted to Defendant will revert to Plaintiffs in the event that Defendant does not take good faith steps to resume the marketing and sale of ION within ninety days]. . . .With the exception of [Defendant's] fulfillment of [Defendant's] obligations, if any, under subparagraph 6(a) above [regarding monetary payments to Plaintiffs in consideration for entering into the Agreement], the termination and reversion of rights as may be permitted hereunder would be [Plaintiffs'] sole remedy in the

event [Defendant] (i) fails to introduce, (ii) publicly introduces or discloses, but does not distribute and promote, or (iii) ceases the distribution and promotion of a product or service derived from [ION].

License Agreement, ¶ 9(d).

Defendant claims that Section 9(d) makes termination and reversion Plaintiffs' sole remedies under the Agreement, while Plaintiffs maintain that they can still sue for damages arising from actions by Defendant other than those enumerated in Section 9(d)(i-iii).  Specifically, Plaintiffs argue that they have the right to damages because Defendant failed to make a product of its "usual high quality" in manufacturing ION.  However, given the meaning of "usual high quality" discussed above, Plaintiffs do not have a remedy in the event that Defendant does not manufacture a product to Plaintiffs' liking.  Plaintiffs had limited rights under the Agreement, as evidenced by their granting to Defendant "the sole and exclusive right, privilege, and license to make, reproduce, modify, use, publicly perform, publicly display, transmit, broadcast, distribute, sell, and/or otherwise exploit or sublicense [ION]."  (License Agreement, ¶ 2(a).)  Furthermore, because Defendant will indemnify Plaintiffs if ION causes personal injury or property damage, Plaintiffs in exchange explicitly "acknowledge that [they] shall have no right to select, control, or arrange the manufacture of [ION]."  (License Agreement, ¶ 8(b).)

The Agreement provides Plaintiffs with the remedies of termination and reversion where Defendant "ceases sales and sublicensing of all products and services embodying [ION] for a period of one (1) year" and where Defendant "(i) fails to introduce, (ii) publicly introduces or discloses, but does not distribute and promote, or (iii) ceases the distribution and promotion of a product or service derived from [ION]."  (License Agreement, ¶ 9(d).)  These are the only circumstances where Plaintiffs had any rights and remedies with respect to ION.  Contrary to

Plaintiffs' argument, the fact that Section 9(d) limits Plaintiffs' remedies to termination and reversion in these circumstances does not support a conclusion that Plaintiffs retain the right to seek money damages related to the quality of manufacture, particularly when the contract expressly awarded Defendant control over all decisions related to manufacture. (See License Agreement, ¶¶ 2(a), 8(b).) Since Plaintiffs had certain rights relating to the introduction, distribution, and promotion of ION, it made sense to define in the Agreement the remedies available for violation of those rights. But where the contract gave Plaintiffs no entitlements, such as with respect to manufacturing, there was no need to limit Plaintiffs' potential remedies for violation of a right which they did not have. Thus, Plaintiffs' remedies are limited to those specifically enumerated in Section 9(d), namely termination of the Agreement and reversion of Plaintiffs' rights to ION.

### 3.    Meaning of the Release in the Amendment to the License Agreement

On January 4, 2006, the parties executed an Amendment to the License Agreement. The Amendment contains a Release, which states in relevant part:

> [Plaintiffs] . . . hereby irrevocably and unconditionally surrender[], relinquish[], release[] and forever discharge[] [Defendant] . . . from any and all claims, suits, demands, liabilities, injuries, [and] damages . . . in law and in equity, whether known or unknown, anticipated or unanticipated, which one or more of the [Plaintiffs] has ever had, now has or could have had, directly or indirectly relating to, arising out of or in connection with [Defendant's] (i) failure to introduce, disclose, market, sell, sublicense, distribute or promote products or services embodying [ION] or (ii) cessation of the introduction, disclosure, marketing, selling, sublicensing, distribution or promotion of products or services embodying [ION]; provided that the foregoing release only shall apply to actions or events that were scheduled to occur, did occur, or failed to occur on or prior to [January 4, 2006]. The parties acknowledge and agree that for actions or events that are scheduled to occur, do occur, or fail to occur subsequent to the date of this Amendment, the provisions of Section 9(d) of the Agreement shall provide for the sole and exclusive rights and remedies available to [Plaintiffs] . . . .

10

Amendment to License Agreement, ¶ 3.

Plaintiffs argue that notwithstanding this provision, they retained their common law remedies for claims that arose prior to the date of the Amendment, including claims arising from representations made by Defendant to Plaintiffs concerning ION.  However, Defendant maintains that by executing the Amendment containing the Release, Plaintiffs released any and all claims against Defendant that arose on or before January 4, 2006.

The language of the Release is clear and bars Plaintiffs from bringing against Defendant any claims that arose on or before January 4, 2006.  With respect to claims arising after January 4, 2006, Plaintiffs are expressly limited to the "sole and exclusive" remedies in Section 9(d) of the Agreement, specifically termination of the Agreement and reversion of Plaintiffs' rights to ION in the event that Defendant "(i) fails to introduce, (ii) publicly introduces or discloses, but does not distribute and promote, or (iii) ceases the distribution and promotion of a product or service derived from [ION]."  (License Agreement, ¶ 9(d).)

Plaintiffs contend that, "[f]rom Plaintiffs' perspective, they negotiated to maintain their common law right[s] [and] remedies prior and subsequent to the date of the Amendment for claims that did not fall within the three exceptions of paragraph 9(d) of the License Agreement." (Pl. 56(a)(1) Statement, ¶ 39.)  According to Plaintiffs, Defendant sent Plaintiffs "an amendment containing a general release which had never been discussed prior to that time," and which Plaintiffs found "completely unacceptable."  (Pl. 56(a)(1) Statement, ¶ 38.)  Thereafter, "[d]iscussions to remove the general release clause continued" (Pl. 56(a)(1) Statement, ¶ 39) and eventually Plaintiffs signed the Amendment with the "negotiated modified release language" that is included in the final version.  (Pl. 56(a)(1) Statement, ¶ 41.)  Yet the language of the executed

Release does not in any way reflect Plaintiffs' alleged understanding that they had successfully negotiated to retain their common law remedies. Plaintiffs are sophisticated business entities whose counsel negotiated the Amendment. As such, it can be assumed that Plaintiffs would not execute any Release that did not fully, accurately, and clearly reflect the final negotiated terms agreed to by the parties, especially with regard to a major term that had been in dispute, such as the retention of common law remedies.

In addition, Plaintiffs received consideration for bargaining away any claims they had against Defendant that arose on or before January 4, 2006. The Amendment converted the $340,000 that Plaintiffs had received as advances against royalties when signing the License Agreement and the three Option Agreements into outright payments, and advanced to Plaintiffs an additional $275,000 as a payment against future royalties. (Amendment to License Agreement, ¶¶ 1-2.) Given the evidence that the relationship between the parties had become strained by January 4, 2006, the Amendment containing the Release clearly was prepared in anticipation of litigation and in an effort to preclude litigation. Plaintiffs are appropriately held to the express language of the Release and are thereby barred from bringing any claims against Defendant that arose on or before January 4, 2006, and are limited to the remedies enumerated in Section 9(d) of the Agreement for claims arising after that date.

### 4.     Validity of the Release Clause in the Amendment

Plaintiffs contend that the Release is void since they were induced to sign the Amendment based on misrepresentations made by Defendant. The factors to consider in determining whether a release is valid are "(1) the existence of consideration for the release, (2) the experience of the person executing the release, and (3) the question of whether the person

executing the release was represented by counsel." <u>Guglielmi v. Rhode Island Hosp. Trust Fin.</u>
<u>Corp.</u>, 573 A.2d 687, 689 (R.I. 1990).  If these factors are satisfied, the Release is valid and
binding provided it has not been obtained by fraud or misrepresentation.  <u>Bonniecrest Dev. Co. v.</u>
<u>Carroll</u>, 478 A.2d 555, 559 (R.I. 1984).  In consideration for signing the Release, Plaintiffs
received $275,000 as an advance payment against royalties, and the $340,000 that Plaintiffs had
previously received for the Option Agreements and License Agreement as advance payments
against royalties instead became outright payments.  (Amendment to License Agreement, ¶¶1-2.)
Plaintiffs are business entities with significant experience in license agreements and were
represented by counsel during these negotiations.  Barry Piels, a partner at Plaintiff LGI, is an
attorney and negotiated the terms of the Amendment with Defendant.  (Decl. Barry Piels, ¶ 46).

Plaintiffs claim that the Release was obtained through fraud and misrepresentation, and is
therefore void.  In addition to the alleged oral representations that Plaintiffs would retain their
common law remedies discussed above, Plaintiffs also allege that in order to induce Plaintiffs to
sign the Release, Hasbro's President at the time, Brian Goldner, promised that "the full might of
Hasbro would be behind ION," that ION "would be heavily promoted," that Defendant would
keep Plaintiffs "informed and involved in legal, technical and marketing issues going forward
with ION," and that Defendant would address functional problems with ION.  (Pl. 56(a)(1)
Statement, ¶¶ 36-37.)  Plaintiffs also maintain that Jeff Jackson, Defendant's production manager
for ION, confirmed these statements to Plaintiffs during a January 3, 2006 telephone conference.
(<u>Id.</u>, ¶ 40-41.)  While there might be an issue of fact as to whether Defendant made these
representations to Plaintiffs, or whether Defendant did so with the intention of Plaintiffs relying
on those representations, Plaintiffs cannot demonstrate that they justifiably relied on the

13

representations allegedly made by Defendant.  See Kelly v. Tillotson-Pearson, Inc., 840 F. Supp.

935, 940 (D.R.I. 1994) ("plaintiffs must have *justifiably relied* on the alleged misrepresentation

negligently or fraudulently made by the defendant" in order to establish negligent or fraudulent

misrepresentation).

As discussed above, substantial negotiations took place between the parties with respect

to the text of the Release. (Pl. 56(a)(1) Statement, ¶¶ 38-39, 41.)  Given that both parties were

sophisticated and represented by counsel, and should have understood that the Amendment,

including the Release, was being prepared in anticipation of litigation, one would reasonably

expect any promises which Plaintiffs had successfully negotiated from Defendant regarding the

marketing of the product, the future involvement of Plaintiffs or the quality of the product to be

reflected in the text of the Amendment.  If these issues were raised in negotiation but do not

appear in the final executed document, it is reasonable to assume that Plaintiffs failed to prevail

in obtaining these concessions but elected to sign anyway, perhaps in unjustifiable reliance upon

verbal representations that did not appear in the Amendment and that contradicted the clear terms

of the Release, which unambiguously released all existing claims.

Furthermore, the Amendment's integration clause states that the Amendment "constitutes

the full and entire agreement between the parties hereto with respect to the subject matter hereof

and supersedes any prior agreement regarding its subject matter, if any, whether written or oral."

(Amendment to License Agreement, ¶ 5.)  This provision places Plaintiffs on notice that they rely

on oral promises made by Defendant at their own risk, because any representations made by

Defendant that are not included in the text of the Amendment will not be binding.  Plaintiffs'

reliance on any verbal representations made by Defendant that were not included in the Release,

14

or that were contradicted by the clear language of the Release, were unjustified.  As the Release was not obtained through a misrepresentation upon which Plaintiffs justifiably relied, the Release is not void.

**B.    Breach of Contract**

**1.    Express Breach of Contract**

Plaintiffs allege that Defendant breached the Agreement by failing to make and distribute a product of its "usual high quality."  (License Agreement, ¶ 8(b).)  However, as discussed above, the use of the term "usual high quality" in the context of the indemnification provision does not create an obligation by Defendant to manufacture a "high functioning" product, as Plaintiffs have contended. (Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 35); see Colonial Penn, 488 A.2d at 736 (citing Woonsocket Teachers' Guild, 367 A.2d at 205) (the Court must look "at the instrument as a whole and not at some detached portion thereof"); see also Newport Plaza,  985 F.2d at 646 (the Court is "duty bound to construe contractual terms in the context of the contract as a whole").  Rather, Defendant agreed to make a product that would not cause personal injury or property damage and to indemnify Plaintiffs in the event that the product did cause such injury or damage.  Therefore, Plaintiffs' express breach of contract claim against Defendant fails since Defendant by the term "usual high quality" did not warranty that it would manufacture a "high functioning" product.

**2.    Breach of the Covenant of Good Faith and Fair Dealing**

Under Rhode Island law, "[v]irtually every contract contains an implied covenant of good faith and fair dealing between the parties."  Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (citing Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I.

15

1996)).  The covenant is adopted to ensure that contractual objectives are achieved.  <u>Fleet Nat'l Bank v. Liuzzo</u>, 766 F. Supp. 61, 67 (D.R.I. 1991) (<u>quoting</u> <u>Ide Farm & Stable, Inc. v. Cardi</u>, 297 A.2d 643, 645 (R.I. 1972)).  While entering into a contract that affords one party discretion "is not tantamount to subjecting oneself to legalized tyranny," <u>Gillette of Kingston, Inc., v. Bank Rhode Island</u>, No. WC 05-0616, 2006 WL 1314259 at *6 n.13 (R.I. Super. Ct. May 5, 2006) (<u>citing</u> <u>Okmyansky v. Herbalife Int'l of Am., Inc.</u>, 415 F.3d 154, 158 n.3 (1st Cir. 2005)), the party's discretion "must be viewed against the backdrop of contractual objectives in order to determine whether [its] actions were done in good faith."  <u>Hord Corp. v. Polymer Research Corp. of Am.</u>, 275 F. Supp. 2d 229, 238 (D.R.I. 2003) (<u>citing</u> <u>Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd.</u>, 748 F. Supp. 936, 942-43 (D.R.I.1990)).  Where a party acts within the confines of the contractual objectives, a party by definition acts in good faith and therefore does not violate the implied covenant of good faith and fair dealing.  <u>Id.</u> (<u>citing</u> <u>Ide Farm</u>, 297 A.2d at 644-45).  The standard to determine whether a party has breached the covenant is whether "the actions in question are free from arbitrary or unreasonable conduct."  <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 66 F. Supp. 2d 317, 329 (D.R.I. 1999).  A party's actions are not arbitrary or unreasonable where its actions, although unfavorable to the opposing party, are based on legitimate business concerns.  <u>See id.</u> at 330 (a defendant did not violate the implied covenant of good faith and fair dealing when it terminated an agreement with the plaintiff because the plaintiff's marketing and sales methods were detrimental to the defendant's image, which was a legitimate business concern).

Defendant relies heavily on <u>Zarella v. Minnesota Mut. Life Ins. Co.</u>, 824 A.2d 1249 (R.I. 2003), in arguing that Plaintiffs must show that they are entitled to recover for an express breach

of contract before Plaintiffs can prove their claim that Defendant breached the implied covenant of good faith and fair dealing.  However, the <u>Zarella</u> court's reasoning is unique to insurance contracts, where courts have determined that an insured cannot make a claim of bad faith against an insurer if the insured was not entitled to recover on the insurance contract in the first place. <u>See</u> <u>Zarella</u>, 824 A.2d at 1261.  In insurance cases, "before a bad-faith claim can even be considered, a plaintiff must prove that the insurer breached its obligation under the insurance contract." <u>Lewis v. Nationwide Mut. Ins. Co.</u>, 742 A.2d 1207, 1209 (R.I. 2000); <u>see also</u> <u>Skaling v. Aetna Ins. Co.</u>, 779 A.2d 997, 1010 (R.I. 2002) ("bad faith is established when the proof demonstrates that the insurer denied coverage or refused payment without reasonable basis in fact or law for the denial").  Thus, in a situation such as this one, which does not involve denial of coverage under an insurance contract, the fact that Plaintiffs cannot successfully maintain an express breach of contract claim does not necessarily preclude their bringing a claim for breach of the covenant of good faith and fair dealing.

Plaintiffs contend that Defendant breached the implied covenant of good faith and fair dealing by manufacturing a product that did not function properly and by shipping that inferior product to consumers, thereby impairing Plaintiffs' potential royalties.  (Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 45-46.)  Specifically, Plaintiffs question Defendant's decision to use what Plaintiffs characterize as inexpensive and inferior software and hardware in order to try to make a greater profit on ION, arguing that in doing so, Defendant breached the implied covenant of good faith and fair dealing.  (<u>See</u> Compl. ¶¶ 35-37, 54; Pl. Mem. in Support of Cross Mot. for Partial Summ. J., 46.)  Plaintiffs also take issue with Defendant's decision to add a camera to the product, a feature which they contend resulted in a host of additional operational

17

problems.  (Pl. 56(a)(1) Statement, ¶¶ 32-33.)  Defendant claims it added the camera in order to create a "point of difference" between ION and similar products made by Defendant's competitors.  (Pl. 56(a)(1) Statement, ¶ 28.)  Defendant maintains that the Agreement gives it "nearly unfettered discretion over the development, production, and marketing of ION" and that it acted within the confines of this discretion when manufacturing ION and therefore did not breach the covenant.  (Def. Motion for Summ. J., 23.)

It is undisputed that there were problems with ION.  (Pl. 56(a)(1) Statement, ¶ 45; Def. 56(a)(2) Statement, ¶ 45.)  However, Defendant's decisions with respect to the design, manufacture, and distribution of ION had legitimate business justifications, were within its discretion, and were not arbitrary or unreasonable.  Defendant sought via features and price to distinguish ION from competing products and acted within the confines of its discretion when it manufactured such a product.  While these business decisions resulted in problems or limitations with the product, Defendant continued to test and attempt to improve ION over the course of several years, ultimately spending $17.7 million on the development and manufacturing of ION. This time and financial commitment to ION by Defendant does not suggest that Defendant acted arbitrarily or unreasonably in regard to ION or disregarded the goals of the contract or Plaintiffs' entitlements thereunder.  Rather, both Plaintiffs and Defendant stood to benefit if ION sold well. Their incentives were aligned in that respect and there is no evidence that Defendant acted in bad faith.  Plaintiffs understood the risk that a product may not do well in the marketplace.  (Pl. 56(a)(1) Statement, ¶ 5.)  Plaintiffs were compensated for conveying the rights to ION to Defendant.  That Plaintiffs disagree with Defendant's business decisions, or even that Defendant made poor business decisions, does not establish that Defendant breached the implied covenant

of good faith and fair dealing.

## C. Fraud and Misrepresentation

### 1. Sufficiency of Pleadings

Under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The pleader must specify in its complaint "the time, place, and content of the alleged false or fraudulent representations." Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)). One purpose of Rule 9(b) is to place Defendant on notice of the acts that form the basis of the alleged fraud and misrepresentation. Dowling v. Narragansett Capital Corp., 735 F. Supp. 1105, 1111 (D.R.I. 1990).

Plaintiffs pled their claims of fraud and misrepresentation with sufficient particularity under Rule 9(b). Plaintiffs included in their Complaint the time, place, and content of the alleged misrepresentations and also how they relied on those representations. Plaintiffs specify instances throughout the period of the Option Agreements and the License Agreement where Defendant made repeat assurances in response to Plaintiffs' concerns about ION's functioning. (Compl. ¶¶ 45, 51, 55.) Plaintiffs maintain that they dropped their demand for a two million dollar guarantee in the Agreement in reliance upon Defendant's commitment to market ION in 2005. (Id. ¶¶ 48-49.) Plaintiffs also allege that the Amendment they signed on January 4, 2006 is void because Plaintiffs were induced to sign it based on misrepresentations made by Brian Goldner, President of Hasbro, on October 17, 2005. Plaintiffs maintain that Goldner promised to market ION heavily and to keep Plaintiffs involved with ION's development, and that other Hasbro

employees reaffirmed these commitments prior to the date of the Amendment.  (Compl. ¶¶ 64-72, 91-93.)  Additionally, Plaintiffs claim that Defendant made misrepresentations after the date of the Amendment, indicating that problems with ION had been resolved and concealing the ongoing problems with ION from Plaintiffs.  (Id. ¶¶ 79-84, 97.)  Plaintiffs claim that in reliance upon these misrepresentations, they elected not to exercise their right to terminate the Agreement and thereby to stop Defendant from shipping ION to stores.  (Compl. ¶ 99.)  Therefore, Defendant was sufficiently placed on notice of the claims of fraud and misrepresentation asserted by Plaintiffs, satisfying the purpose of Rule 9(b).  See Dowling, 735 F. Supp. at 1111 ("one purpose of the rule is to provide the defendant with information that is sufficiently particularized to enable him to understand the precise nature of the allegations and to prepare a response").

Plaintiffs respond that regardless of whether they pled with sufficient particularity under Rule 9(b), Defendant waived its objection by not raising the alleged deficiencies in Plaintiffs' pleading until nineteen months after Defendant filed its answer.  Indeed, Defendant waited until after discovery was complete to raise its objection of insufficient pleading.  After discovery, Defendant has information regarding Plaintiffs' allegations far exceeding that which would appear in even the most comprehensive complaint.  Defendant cannot at this late stage bring an objection to Plaintiffs' pleadings on grounds of insufficient particularity.  See generally Todaro v. Orbit Int'l Travel, Ltd., 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991) ("[A] party who fails to raise a 9(b) objection normally waives the requirement." (quoting United Nat'l Records, Inc. v. MCA, Inc., 609 F. Supp. 33, 39 (N.D. Ill. 1984))).

### 2.      Standards for Fraud and Misrepresentation Claims

To establish fraud and misrepresentation under Rhode Island law, Plaintiffs must prove

that "1) [Defendant] made a false representation; 2) [Defendant] intended to induce [Plaintiffs] to

rely on that representation; and 3) [Plaintiffs] justifiably relied on the representation to [their]

detriment." Fraioli v. Lemcke, 328 F. Supp. 2d 250, 268 (D.R.I. 2004) (citing Women's Dev.

Corp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001)).  In order to avoid summary

judgment, Plaintiffs must establish that a genuine issue of material fact exists as to whether

Defendant made a false representation intending Plaintiffs to rely on that misrepresentation, or as

to whether Plaintiffs justifiably relied on the misrepresentation to their detriment.  Hasbro, Inc. v.

Mikohn Gaming Corp., 491 F. Supp. 2d 256, 264-65 (D.R.I. 2007).

To establish negligent misrepresentation under Rhode Island law, Plaintiffs must

establish that (1) Defendant made a material misrepresentation, (2) Defendant either knew "of

the misrepresentation, [made] the misrepresentation without knowledge as to its truth or falsity,

or [made] the misrepresentation under circumstances in which [Defendant] ought to have known

of its falsity," (3) Defendant intended Plaintiffs to act on the misrepresentation, and (4) Plaintiffs

justifiably relied on the misrepresentation to their detriment.  Manchester v. Pereira , 926 A.2d

1005, 1012 (R.I. 2007) (quoting Mallette v. Children's Friend & Service, 661 A.2d 67, 69 (R.I.

1995)).

### 3.      Representations by Defendant Prior to the Amendment

On January 4, 2006, Plaintiffs and Defendant signed the Amendment containing

the Release, which reads in relevant part:

> [Plaintiffs] . . . hereby irrevocably and unconditionally surrender[], relinquish[],
> release[] and forever discharge[] [Defendant] . . . from any and all claims, suits,
> demands, liabilities, injuries, [and] damages . . . in law and in equity, whether
> known or unknown, anticipated or unanticipated, which one or more of the
> [Plaintiffs] has ever had, now has or could have had, directly or indirectly relating

21

to, arising out of or in connection with [Defendant's] (i) failure to introduce, disclose, market, sell, sublicense, distribute or promote products or services embodying [ION] or (ii) cessation of the introduction, disclosure, marketing, selling, sublicensing, distribution or promotion of products or services embodying [ION] . . . [for] actions or events that were scheduled to occur, did occur, or failed to occur on or prior to [January 4, 2006].

Amendment to License Agreement, ¶ 3.

As discussed in detail above, this provision is sufficiently comprehensive to release Defendant

from liability for any alleged misrepresentations made by Defendant to Plaintiffs about ION on or

before January 4, 2006, and Plaintiffs have not demonstrated that the Release is void.

### 4.   Representations by Defendant Subsequent to the Amendment

Plaintiffs claim that Defendant continued to misrepresent to them after January 4, 2006

that problems with ION had been resolved.  (Compl. ¶¶ 79-84, 97.)  Plaintiffs maintain that in

reliance upon this misrepresentation, they elected not to exercise their right to terminate the

Agreement and thereby to stop Defendant from shipping ION to stores.  (Compl. ¶ 99; Pl. Mem.

in Support of Cross Mot. for Partial Summ. J., 59.)  The success of Plaintiffs' misrepresentation

claim is therefore dependent on whether Plaintiffs in fact had the ability, at the time in question

or for the reasons cited, to terminate the Agreement or otherwise influence Defendant's decision

to ship ION.

While Defendant had the right to terminate the Agreement "at any time and for any

reason" (License Agreement, ¶ 9(b)), the Agreement did not afford Plaintiffs the same right.

Rather, Plaintiffs' termination rights were limited to the circumstances set forth in Section 9(d)

of the Agreement, specifically where Defendant "ceases sales and sublicensing of all products

and services embodying [ION] for a period of one (1) year" or where Defendant "(i) fails to

22

introduce, (ii) publicly introduces or discloses, but does not distribute and promote, or (iii) ceases the distribution and promotion of a product or service derived from [ION]." (License Agreement, ¶ 9(d).)  Because Defendant introduced ION to the market in 2005 and distributed the product in 2006 (Pl. 56(a)(1) Statement, ¶ 30, 82, 95), Plaintiffs could not have exercised their right to terminate the Agreement until December 2007, one year after Defendant communicated to Plaintiffs in December 2006 that it would be "dropping ION." (Id., ¶ 108). Furthermore, as previously discussed, Section 9(d) does not give Plaintiffs the right to terminate the Agreement based on how Defendant manufactured the product.  Rather, the Agreement grants to Defendant the exclusive right to manufacture ION without interference from Plaintiffs. (See License Agreement, ¶ 8(b).)  Thus, even if Defendant had informed Plaintiffs after January 4, 2006 that problems with ION persisted, Plaintiffs did not have the right to terminate the Agreement on that basis.  Plaintiffs did not detrimentally rely on Defendant's alleged misrepresentation where Plaintiffs were not free to act on the purportedly concealed information even if they had known it.

### D.       Breach of Fiduciary Duty

To determine whether a party owes a fiduciary duty to another party, the Court will consider (1) the reliance of one party upon the other, (2) the prior relationship of the parties, (3) the level of business sophistication of the parties, and (4) the willingness of one party to follow the other's guidance.  Cafe La France, Inc. v. Schneider Sec., Inc., 281 F. Supp. 2d 361, 372 (D.R.I. 2003); Simpson v. Dailey, 496 A.2d 126, 129 (R.I. 1985).  Under Rhode Island law, "the creation of a fiduciary duty depends upon the facts surrounding the relationship between the parties."  VanWest v. Midland Nat'l Life Ins. Co., No. 98-76, 2000 WL 34019293, at *3 (D.R.I.

Mar. 27, 2000). Although the question of whether, in a particular factual setting, a fiduciary relationship exists may be a question of fact, Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995), the existence of such a relationship "is limited to the unusual case where the relationship goes far beyond that found in an ordinary business transaction." Fraioli, 328 F. Supp. 2d at 267 (citing VanWest, 2000 WL 34019293, at *3). Therefore, courts can determine whether a fiduciary duty exists on summary judgment where the facts surrounding the relationship of the parties warrant such a determination. See Rhode Island Hosp. Trust Nat'l Bank v. Bogosian, 11 F.3d 1092, 1101 (1st Cir. 1993) (upholding district court's fiduciary duty determination on summary judgment). Facts giving rise to a fiduciary duty "must be sufficient to establish a special relationship of trust and confidence that requires the purported fiduciary to act in the best interests of the other party rather than in its own best interests." VanWest, 2000 WL 34019293, at *3. Such relationships "are not lightly inferred in commercial transactions where each party seeks to accomplish its own business objectives and those objectives may conflict" and where neither party "is required to act in the best interest of the other party." Id.

The facts alleged by Plaintiffs do not support their contention that Defendant owed Plaintiffs a fiduciary duty. Plaintiffs and Defendant had a conventional business relationship where both parties negotiated at arms length. While Plaintiffs claim that they had unequal bargaining power, Plaintiffs were represented by counsel and are experienced and sophisticated business entities. See Bogosian, 11 F.3d at 1101 (taking into account experience of a party as well as representation by counsel to determine that a fiduciary relationship did not exist between a bank and a borrower). In arguing that Defendant had a fiduciary duty to Plaintiffs, Plaintiffs rely on the fact that they had thirty years of good business relations with Defendant, and had

24

come to trust Defendant and rely implicitly on its good faith.  Thirty years of good business relations between Plaintiffs and Defendant were still business relations, and Plaintiffs do not present evidence that shows Defendant was obligated to act in Plaintiffs' interests rather than its own interests, nor was it reasonable for Plaintiffs to expect Defendant to do so.  See VanWest, 2000 WL 34019293, at *3 (facts giving rise to a fiduciary duty must "establish a special relationship of trust and confidence that requires the purported fiduciary to act in the best interests of the other party rather than in its own best interests").

Furthermore, the fact that Plaintiffs stood to earn royalties under the Agreement does not create a fiduciary duty to Plaintiffs by Defendant.  In making the argument that the facts surrounding the parties' licensor/licensee relationship gives rise to such a duty, Plaintiffs rely heavily on Burt v. Rhode Island Hosp. Trust Nat'l Bank, No. 02-2243, 2006 WL 2089254 (R.I. Super. Ct. July, 26, 2006), which determined that there were disputed issues of material fact as to whether a corporation owed a fiduciary duty to beneficiaries of an estate.  In Burt, the plaintiffs were beneficiaries of an estate that included stock in a corporation, and the executors of the estate were directed to offer the stock back to that corporation.  Id. at *1-2.  The corporation reacquired its stock at a price unsatisfactory to the plaintiffs, and the plaintiffs subsequently claimed that the corporation had breached its fiduciary duty to them by misrepresenting the true value of the stock to the plaintiffs' detriment.  Id. at *2-3.  The plaintiffs in Burt could not establish a fiduciary duty based on a traditional corporation-shareholder relationship, but the Court determined that there were disputed issues of material fact as to whether a fiduciary duty existed nonetheless.  Id. at *16-18.  The relationship between the beneficiaries of the estate and the corporation in Burt is closely related to a traditional province of fiduciary duty founded in the corporation-shareholder

25

relationship, <u>Lawton v. Nyman</u>, 327 F.3d 30, 38 (1st Cir. 2003), and is clearly distinguishable from the context here.  Neither the long-term business relationship between the parties nor the provision for royalties in the contract are sufficient to establish a fiduciary duty by one party to the other where, as here, both parties are sophisticated commercial entities contracting at arms length.  A fiduciary duty is "not lightly inferred from commercial transactions where each party seeks to accomplish its own business objectives."  <u>VanWest</u>, 2000 WL 34019293, at *3.

## IV.    Conclusion

For the reasons stated herein, Defendant's motion for summary judgment [Doc. No. 30] is **GRANTED** and Plaintiffs' cross motion for partial summary judgment [Doc. No. 34] is **DENIED**.  The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, July  24 , 2009.

_____/s/_____

Peter C. Dorsey, U.S.D.J.